The Department of Defense, 2008, 33-43. Mr. Owen. Mr. Kim was a structural engineer. Presumably he didn't design shoes. No, he did not, your honor. May it please the court. My name is Kevin Owen. I represent Sung Kim, petitioner. We're here today to review the legal conclusions of the administrative judge in determining whether or not the agency reasonably and accurately measured the performance of Dr. Kim when they effectuated Chapter 75 performance removal. He had to be certified to have this position, right? Right. That's a certification. Failed three times. Doesn't that put an end to this? The fact that he was sent for three assessments and they determined that he failed is not, in our view, an accurate measurement of his performance. Saying that he wasn't certified is just a broad brush allegation from the agency that he just wasn't performing adequately. What needs to be analyzed was what his actual performance was during the certification attempts. Are you suggesting that here on appeal we're supposed to do a performance appraisal? I mean, look through all of the work this person did and try to lend some sort of objective assessment of the entire record in order for us to evaluate what his performance was like. Is that what you're asking us to do? No, not at all. What we're asking the court to do is to look at the evidence that's in the record because we're not arguing the facts or disputing the facts. The facts are what the facts are and they are in the record. What we're asking is that there is a burden of proof by the preponderance of the evidence for the agency to have proof that it accurately and reasonably measured Dr. Kim's performance during these assessments. Now, there was no discussion in the administrative judge's decision about how and what metric or what assessment criteria was used by these managers in determining what his performance was. There's a case law cited by the board after the Luption decision in this court. Presumably if we have three separate rejections by three separate analyzers in three separate tests, that pattern suggests some inadequacy, doesn't it? Not in and of itself. What the managers are required to do is give the employee under a Chapter 75 removal notice and opportunity to respond to the specific deficiencies. Now, a broad allegation that the employee was simply performing subpar or that his writing was illogical without any specific explanation articulating what it was that was subpar or illogical does not give the employee adequate notice and opportunity to respond. In this court's decision in Luption, the- That's not this case. That's not this case. I mean, the whole history of this is we had the three rejections. There were numerous opportunities. Is he suggesting here he had no clue that this was going to happen? He had no idea what he was doing wrong and therefore could never fix it? The judge in her decision relied heavily on testimony that Dr. Kim just simply did not appear to know what he was doing vis-a-vis the benchmarks. Now, in the appendix at 969, the benchmarks appear. They are an accurate measurement, a listing of all tasks that Dr. Kim was to perform on his assessments. And the managers and the trainers all testified that they brought these benchmarks with them and that they evaluated them according to these benchmarks. These benchmarks could allow for subjective evaluation of a performance, or they could allow for objective evaluation depending on the circumstance. It would give great deference to the supervisor in determining how well he performed his tasks. So are you saying we shouldn't give- we can't uphold removals if they're based on subjective assessments? Not at all. In fact, subjective assessments, and this is what's argued in the brief, subjective assessments sometimes are the only way that a supervisor can evaluate performance. There has to be a metric. It has to be tracked. The supervisors, especially if they're relying on subjective assessments, must be able to articulate with reasonable specificity what it is that Dr. Kim was alleged to have done wrong. If you look at the testimony that's cited in the briefs, supervisor after supervisor said- made broad conclusory statements that Dr. Kim simply didn't understand benchmarks. When asked at hearing how many benchmarks he understood or demonstrated understanding, they couldn't testify. When asked to specify which benchmarks he failed to demonstrate understanding, they couldn't identify with specificity. Dr. Kim has no opportunity to understand what that charge is, or reasonable opportunity to respond to the charges, if the managers are unable to articulate with reasonable specificity what it is that he was alleged to have done improperly. Now, the board addressed this issue about reasonable and accurate measurement in the cases of Wellman, Huffman, and Glover. Now, respondent argues in their response that the case of Dr. Graham, Orlando Graham versus the Air Force, somehow either supersedes or otherwise makes Wellman, Huffman, and Glover irrelevant. That's not the case. In fact, in Graham, the board specifically says that we recognize that this may be in contrast to Wellman, Huffman, and Glover, but it is not in fact- we're not in fact overruling it. And taken as a whole, the Wellman, Huffman, Glover case line ending with Graham stands for the proposition that in order to reasonably and accurately measure an employee's performance, there may be objective criteria if the job lends itself to objective criteria. A clerk typist in Chang versus Veterans Affairs, in the instance of a pharmacist, there could be objective measurements. But under Graham, there's very subjective measurements. Dr. Graham was held to a degree of patient care. Now, when the Graham case came before the board, the initial charge was failure to maintain credentialing, which is very similar to what's going on in Dr. Kim's case, which is failure to maintain certification. However, in Graham, the board sought the underlying specifications, and in Graham, the agency produced six specific specifications of patient care with the patient records, the diagnosis, and the names of the patients with a great deal of specificity so that Dr. Graham could understand exactly what the allegations of poor performance were. In Dr. Kim's case, he failed to become certified, he failed to produce sufficient written reports, and he failed to demonstrate currency in understanding the expertise of his field. All three of those objectives relate back to these benchmarks. Now, on the second performance objective, the agency maintained that he, being Dr. Kim, was unable to adequately meet this objective because the outbriefs were, in the agency's response brief, illogical and simply made no sense. However, there's no evidence in the record as to how Captain McCarthy, the deciding official, reached the conclusion that it was illogical, how the writing made no sense, and the written submissions were not put into the record. Now, without an articulation as to how the deciding official reached the conclusion as to why it was illogical and made no sense, there's no opportunity for Dr. Kim to reasonably respond, and furthermore, without that articulation, the judge couldn't have reached the conclusion that it was accurately measured. What's the metric? What's the specific underlying evidence that led to the conclusion that that metric was reached? Now, the only discussion from the administrative judge in her decision about accurate, reasonable measurement appears in the initial decision on page three, simply citing to Moore, Graham, and Wellman. No legal reasoning was provided as to how the accurate measurement was addressed, and under the board's decision in Spithall v. OPM, the A.J. is required to set forth specific discussion and legal reasoning as to how she reached conclusions of law, such as the requirement that the performance of the employee be reasonably and accurately measured. And absent that discussion, which this entire record is devoid of from the administrative judge, the administrative judge is entitled to no deference on that decision. Now, in the petitioner's brief, there is citations from the administrative judge, statements such as she found that petitioner did not seem to understand the importance of the benchmarks at the decision at 11. However, the supervisor that she cites, Hudson, was asked, did you make notes on the benchmarks on which ones he covered, which ones he didn't? The supervisor testified, no, I did not. You didn't actually keep track benchmark by benchmark? No, I didn't keep track at all. What is the standard for which he was rated against? Now, it was subjective, possibly, but it wasn't articulated, and if you look at the judge's decision, she cites the fact that performance standards must be, I'm citing to the AJ's decision at 30, I'm sorry, 29. The general rule is that performance standards must, to the maximum extent feasible, permit the accurate appraisal performance based on objective criteria and must be reasonable, realistic, and clearly stated in writing. It's clear from the record that many of these supervisors did not, and they admitted at hearing that they did not review Dr. Kim's performance objectives prior to evaluating him. They didn't review his position description. They didn't review and they admitted they didn't rate him according to these benchmarks, that they were supposed to evaluate him accordingly. Therefore, the only conclusion is that they were creating these evaluations based on their own understanding of what they believed the job duties were to be. Now, under Wellman, that's not acceptable. And furthermore, they wouldn't have been communicated in advance. Many of the supervisors testified that they just seemed to observe and believe that he was performing in a certain way and that they didn't think that it was to the level of their satisfaction. When asked what level of satisfaction was, there was, and this is in the brief, there was differing accounts as to what a passing grade was. Some said a C. Some said it was satisfactory, but not well enough. Some said that the deciding official said he just didn't feel comfortable as to the level of performance. That does not allow for Dr. Kim to reasonably understand with any specificity what the alleged performance problem was. And he's not able to respond to that. Thank you. I reserve the rest of my time for rebuttal. I'm going to save it for you, Ms. Osbert. May it please the court. The court should affirm the decision below because there is substantial evidence in the record demonstrating that the agency accurately and reasonably measured the petitioner's performance. Mr. Kim, or Dr. Kim, I should say, was advised of his performance objectives in advance, in writing, and then reminded of them again four months later. He was provided continuous training and feedback about his performance through, as one of your honors mentioned, three chances at certification. And he was advised of his failure to meet the objectives throughout the process, ultimately ending up in his being removed. Petitioner's counsel has made many statements about the inadequacy of the record, but I think his characterization of the record is incomplete. Dr. Kim's reviewers and evaluators were at all times aware of the benchmarks that Dr. Kim was supposed to meet, and they'd spent inordinate amounts of time telling him what he was doing wrong. Mr. Sheff, one of the senior instructors, said that he- Mr. Owen is seemingly looking for quantitative measurements. Okay. Quantitative measurements were appropriate in the Wellman, Glover, and Huffman cases because in that case, in those cases, the people who were being evaluated were clerk typists or benefits authorizers. In those cases, the standards that applied to them had numerical error rates in them. But under Chapter 75, it's not necessary that the employee be evaluated on objective standards. Even under Chapter 43, objective standards are not required, particularly in the case like Dr. Kim's, where he was in a high-level GS-14 position, a senior civilian member of a team that's sole mission was to go to military installations around the world and determine whether or not those military installations were secure from terrorist attacks. He was a structural engineer who was expected to evaluate the installations from an engineering standpoint, but equally important, and this is where he really could not perform, he had to be able to communicate in writing and verbally to the installation and to his team chiefs, who were mostly military, why the installation did or did not meet the benchmarks and what could be done to improve it, and to do this in layman's terms, rather than the terms of a structural engineer. I'd just like to give you a few examples of the types of evidence that were in the record about Dr. Kim's failings. Mr. Owen made reference to Mr. Hudson. Oh, Mr. Hudson didn't take notes, but at the hearing, Mr. Hudson testified that each step of the way, he told Dr. Kim, this is what you're supposed to do, and to the extent it was done wrong, he told him he did it wrong. At the hearing, he testified that Dr. Kim didn't meet the benchmark for assessing access control points. He did not analyze the vehicle barrier plant, another benchmark. His slides that were critical for demonstrating to the installation what they were doing wrong were inaccurate. He had inaccurate measurements in those slides. So he, step by step, told Dr. Kim what he was doing wrong. Similarly, Mr. Sheff, he said that he carried the benchmarks with him and told Dr. Kim each step of the way, this is what you did wrong here, this is what you did wrong here, this is what you did wrong here. Similarly, Dr. Kim was subjected to performance counseling three separate times during his attempted certification process. And those performance counseling sessions told him what objectives he was or was not meeting, pursuant to the performance plan that had been set out for him in advance. Also, Mr. Owen mentioned that the managers all provided different accounts and different methodologies for appraising Dr. Kim. Well, that's not accurate either. All of them knew their jobs. They had done it numerous times and knew what was required each step of the way for an assessment to be done. Dr. Kim had been given training on what was to be done. Dr. Kim was assigned these senior instructors to tell them each step of the way what needs to be done. And in the context of the benchmarks. And as I've already mentioned, the benchmarks were important and the senior instructors told him what he did wrong in the benchmarks, but equally important was his ability to communicate. He would attempt to give tutorials to installation members that were basically aborted because he wasn't doing it the way he was supposed to. In another case, the top military personnel started to walk out because they simply couldn't understand what Dr. Kim was trying to say. He would put up slides and his observations didn't match up to the slides. His recommendations didn't match up to the slides. And all of this is in the record. People testified about it and there was written, there was documentary evidence along the way as well. In his last performance, during his last attempt in Parris Island and Charleston, South Carolina, he wrote a report. And I think Mr. Owen implied that the team chiefs who testified weren't clear about what was wrong with the report other than it made no sense. But the record clearly reflects that the report was late. The final draft was full of mismatched content and recommendations. He needed help writing it and he needed help rewriting it. At that point, the report was still unacceptable. He had mismatched discussion and options with the wrong recommendations. And here we're talking about highly technical material. You have to lay out the technicalities and then explain what needs to be done. He didn't follow procedure and he had the reference to wrong unified type standards. Another time when he was giving a slideshow, he was citing the wrong Department of Defense standards in trying to explain to an installation how their anti-terror system was working. He understood the engineering, but he could not tie it into anti-terrorist considerations and convey that to either the team chiefs, the military personnel on his own team, or the military installations. And the record is clear about that. For instance, in one case he was expected to do slides as part of an outbrief or a briefing of his superiors. Again, there was mismatched content combining manned and unmanned ACPs. He placed mitigating solutions in incorrect places. Incorrect Department of Defense standards. At one point, one of the military personnel who testified at the hearings said that the installation had asked a couple of technical engineering questions of the team. So he said to Dr. Kim, okay, I'd like you to answer these questions. Could you come back in 24 hours? Well, this was on the last attempt. He came back after 24 hours and he couldn't come up with the answers. This type of performance is just unacceptable under any standard. But if you look at the three standards that were set out by the agency, he clearly didn't make them. He couldn't conduct assessments in accordance with guidelines. He didn't properly prepare to conduct assessments. He didn't meet the training criteria. He couldn't develop professional outbriefs and technically professional reports of assessment. And he couldn't display the subject matter through writing remarks and participation in professional fora. He was inadequate in every way except that he was a competent engineer. And I'd just also like to emphasize that for purposes of Chapter 75, you don't need to have an off-the-shelf checklist by which the person should be evaluated. In this case, like I said, all of his supervisors knew what he was supposed to be doing. And they did report to the team chiefs about what his failings were, both in emails and in memos and then ultimately in the performance counseling. It's not like the record is not devoid of evidence to support the decision here. In fact, the judge spent 25 pages outlining the process of evaluating Dr. Kim. And then at pages, I think it's A28 to 30, she does say, here's the standard. At A3, she says it's accurate and reasonable. And then at 28 to 30, she says, in this case, we can be more subjective because it's a very high-level position. There was a great deal of discretion incumbent in the position. And let's look at the three standards that Dr. Kim was subject to and let's see how he didn't meet them, referring back to the overwhelming evidence that she had already summarized. So for Mr. Owen to say that there wasn't a methodology set forth or that the judge didn't apply the accurate and reasonable standard is really without basis. Anything further? No, Your Honor. We can just ask that the court affirm the decision. Thank you, Ms. Hossford. Owen has four minutes to rebut. Just briefly and rebuttal, Your Honor. We're not arguing, as Respondent is requesting that, or referring that there has to be some sort of off-the-shelf checklist in order to do a performance of removal under Chapter 75. There has to simply be a reasonably articulate and specific statement as to what it was that Dr. Kim did incorrectly. The agency says that he had given inaccurate or somehow gave tutorial briefings in which he skipped slides or that he just didn't cover information. In the record, it was asked, what information did Dr. Kim not present during these briefings? And none of the witnesses could identify what it is that he was alleged to have not presented. Now, without knowing what it was that he was not presenting, how was he to respond to that allegation? Other than simply avert, yes, I presented it. In the report, saying that the reports were illogical, that they had mismatched information. Well, what was mismatched? What specific information was not covered adequately in that report? That is not in the record. That is not something that was presented. The reports were not in the record. And therefore, Dr. Kim had no meaningful opportunity to respond to that allegation. This court in Lovshin recognized that the MSPB acted as intervener in that case, urging this court to only allow Chapter 43 performance removals because there are merit principles that Congress interposed in Chapter 43. This court recognized that any burden that would be placed on the appellant to have a Chapter 75 performance removal would be ameliorated by the bigger burden placed on the agency in meeting the higher burden of proof by the preponderance of the evidence. And therefore, in a case such as this, where there is just strict deference to the agency manager's observations of their professional opinions, that does not give to the higher burden of proof. That might be enough to reach substantial evidence under Chapter 43, but under Chapter 75, there is a much higher burden of proof to show that it was reasonably and accurately measured. There was no discussion in the judge's decision as to what the metrics were. There was no discussion in the judge's decision as to how the actual evaluation standards were reasonable. It is true. Highly technical jobs can have subjective interpretations, but there must be some tracking and reasonable articulation as to what it was that Dr. Kim had done inadequately. And the record is replete and the petitioner's brief is replete with testimony, sites, and line by line of manager after manager stating when pressed what it was specifically during that hot wash, or during that presentation, or during that report that Dr. Kim did inadequate. They weren't able to identify to that level of specificity. And so a broad brush allegation that it was just poor performance wasn't sufficient to allow Dr. Kim to be able to respond. Unless there are any further questions, I have nothing further. Thank you. Mr. Rowan will take the case on revising. Thank you.